ASH

1

2    WO

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8

9    Desman Mayes,                          No.  CV 19-00403-PHX-MTL (JFM)

10                     Plaintiff,

11   v.                                     **ORDER**

12   James Blair, et al.,

13                     Defendants.

14

15        Plaintiff Desman Mayes, who is currently confined in the Arizona State Prison

16   Complex-Safford, brought this civil rights action pursuant to 42 U.S.C. § 1983.

17   Defendants move for summary judgment.  (Doc. 28.)  Plaintiff was informed of his rights

18   and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998)

19   (en banc) (Doc. 32), and he opposes the Motion.  (Doc. 37.)[1]

20

21        [1] Defendants assert that Plaintiff failed to file a Memorandum in opposition to the
     Motion for Summary Judgment, but instead filed only a controverting statement of facts.
22   (Doc. 38 at 1-2).  Defendants request that the Court therefore "grant the Motion pursuant
     to Local Rule 7.2(i) …" (*Id.* at 2).  Local Rule of Civil Procedure 7.2(i) provides that the
23   Court may deem a party's failure to respond to a motion as consent to the granting of the
     motion.  LRCiv. 7.2(i).  However, the Ninth Circuit held in *Heinemann v. Satterberg* that
24   a local rule permitting a district court to treat the lack of a response as consent to granting
     a motion does not apply to summary judgment motions.  731 F.3d 914, 917 (9th Cir. 2013)
25   (finding that Western District of Washington Local Rule 7(b)(2) conflicts with Federal
     Rule of Civil Procedure 56 and cannot provide a valid basis for granting a motion for
26   summary judgment).  If a summary judgment motion is unopposed, Rule 56 "authorizes
     the court to consider a fact as undisputed," but it does not permit the court to grant summary
27   judgment by default.  *Id.*  Indeed, under the summary judgment standard, if the moving
     party fails to meet its initial burden of production, the opposing party need not produce
28   anything at all.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-
     03 (9th Cir. 2000).  The Court will therefore deny Defendants' request for summary
     disposition, and will address the Motion for Summary Judgment on the merits.

## I.     Background

On screening pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Fourth and Fourteenth Amendment claims against Defendants City of Tempe Police Officers Blair, Hatcher, Gneck-Smith, Troy, Foth, and Marufo in Count One; Fourth Amendment excessive force claims against Defendants Hatcher, Gneck-Smith, Troy, Foth, and Marufo in Count Two; and a failure to train or supervise claim against Defendant Hatcher in Count Two; and directed them to answer the Complaint.  (Doc. 7.)  The Court dismissed the remaining Defendants.  (*Id.*)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Relevant Facts[2]

Plaintiff was arrested on August 13, 2017 for shoplifting, and transported to Tempe City Jail. (Doc. 29-1 at 2 ¶ 6.) At the jail, Defendant Troy uncuffed Plaintiff and began to search him as part of the jail's booking procedure while Defendant Foth stood nearby. (*Id.* ¶ 8; *id.* at 6 ¶¶ 4-6.) When Plaintiff took off one of his socks, two small, clear plastic bags fell out onto the floor. (*Id.* at 2 ¶ 9; *id.* at 6 ¶¶ 7-8.) The baggies contained a white crystal substance that Foth and Troy identified as methamphetamine. (*Id.* at 2 ¶ 10; *id.* at 6 ¶ 8.) Plaintiff grabbed the bags and stuffed them into his mouth. (*Id.* at 3 ¶ 14; *id.* at 6-7 ¶¶ 9-13.) Plaintiff denies that there were any baggies, but states that there were "two pills" which he "grabbed… and swallowed" instead. (*Id.* at 76.)

Foth and Troy attempted to stop Plaintiff from swallowing the drugs because the amount of methamphetamine could cause a lethal overdose, and to prevent Plaintiff from destroying evidence. (*Id.* at 3 ¶¶ 15-16; *id.* at 6-7 ¶¶ 12-13.) Troy and Foth restrained Plaintiff on the floor on his stomach in a controlled hold. (*Id.* at 3 ¶17; *id.*at 6-7 ¶¶ 12-13.) Defendants Hatcher and Gneck-Smith came to assist Troy and Foth. (*Id.* at 62 ¶¶ 7-8; *id.* at 94 ¶ 5.) The officers attempted to place Plaintiff back in handcuffs, keep Plaintiff still, prevent him from swinging his arms and legs or turning his head, and to spit out the drugs. (*Id.* at 3 ¶ 19; *id.* at 7 ¶ 13; *id.* at 62 ¶ 8; *id.* at 94 ¶ 7.) Plaintiff denies that he was swinging his arms or legs, and states that he had already swallowed the pills. (Doc. 37 at 2-3.) Foth applied pressure points to Plaintiff's ears and nose in an attempt to get him to spit out the drugs, but Plaintiff did not spit the drugs out. (Doc. 29-1 at 3 ¶ 20.) Foth, Hatcher, and

---

[2] The Court will combine the factual assertions of the parties' briefs in the interest of providing a cogent narrative, and will note any relevant disagreements between the parties as necessary.

Gneck-Smith could see the drugs in Plaintiff's mouth and could hear him chewing and gagging on them as he attempted to swallow them.  (*Id.* at 3 ¶¶ 22-23; *id.* at 62 ¶ 11; *id.* at 94-95 ¶ 13.)  Plaintiff denies chewing on anything, and states that he was gagging because officers attempted to force a pen and their fingers down his throat.  (Doc. 37 at 3-4.)

After approximately seven minutes, Plaintiff was warned that he would be tased if he did not comply with the officers' commands.  (Doc. 29-1 at 94 ¶ 7.)  At Hatcher's direction, Gneck-Smith deployed her taser, but only one probe made contact with Plaintiff and no charge was administered.  (Doc. 31 at 5 ¶ 21; Doc. 29-1 at 94 ¶ 8; Doc. 29-1 at 97 ¶ 5.)  The officers repeatedly told Plaintiff to "spit it out" and that "it will all be over as soon as you spit it out," but Plaintiff did not comply.  (Doc. 29-1 at 3 ¶ 21; Doc. 29-1 at 94 ¶ 12.)  Plaintiff asserts that Toth, Hatcher, and Gneck-Smith "were mistaking [Plaintiff's] tongue" for baggies of drugs.  (Doc. 37 at 4.)

Defendant Hatcher next attempted to remove the drugs from Plaintiff's mouth by sweeping her right thumb through Plaintiff's mouth.  (Doc. 29-1 at 3 ¶ 24; Doc. 29-1 at 94 ¶ 10; Doc. 31 at 5 ¶ 15.)  Plaintiff bit Hatcher's thumb, causing her to yelp and pull her hand back.  (Doc. 29-1 at 3 ¶25; Doc. 29-1 at 94 ¶ 10; Doc. 31 at 5 ¶ 15.)  Plaintiff denies biting Hatcher intentionally, but admits that he may have done so accidentally.  (Doc. 37 at 5; Doc. 29-1 at 71.)  Defendant Gneck-Smith then deployed her taser in stun mode by pressing it against Plaintiff's upper right shoulder area and delivering a charge for one second.  (Doc. 29-1 at 95 ¶ 14; Doc. 29-1 at 97 ¶ 6.)  Plaintiff continued to resist the officers' commands, and Gneck-Smith deployed the taser in stun mode again by pressing it against the back of Plaintiff's right shoulder and delivering a second charge for one second.  (*Id.* at 95 ¶ 15-16; *id.* at 97 ¶ 6.)  Plaintiff asserts that there were "several officers" with tasers, and that he believes he was tased seven times.  (Doc. 37 at 5-6.)

Hatcher then asked for a pen, and Foth gave her a ball-point pen in her vest.  (Doc. 29-1 at 3 ¶ 26; Doc. 31 at 5 ¶¶ 19-20.)  Hatcher attempted to use the pen to sweep the drugs out of Plaintiff's mouth, but Plaintiff kept his mouth shut and Hatcher could not get the pen past his teeth.  (Doc. 31 at ¶ 19.)  Plaintiff asserts that Hatcher "attempted to shove the pen

down [Plaintiff's] throat to get him to throw up," and that it broke one tooth "down to the root and required oral surgery to be removed" and "another [tooth] was chipped." (Doc. 37 at 6, 8.)

After approximately 10-15 minutes, the officers observed that Plaintiff had swallowed the drugs and was no longer resisting. (Doc. 29-1 at 4 ¶ 27.) The Tempe Fire Department was called to check on Plaintiff due to his ingestion of drugs, and Defendants kept Plaintiff restrained on the floor until they arrived. (*Id.* at 4 ¶ 28; *id.* at 63 ¶ 23.) The paramedics checked Plaintiff's vitals, administered a ketamine injection into each of his buttocks to sedate him, and transported him to the hospital. (*Id.* at 104 ¶ 4.) Plaintiff asserts that Defendants performed a body cavity search "while [he] was being tased," and that he was "tortured" until he lost consciousness. (Doc. 37 at 7-8.) The paramedics' records make no mention of bleeding or broken teeth, and state that Plaintiff's extremities were intact. (Doc. 29-1 at 115-117.) Plaintiff was examined at the hospital emergency room; the exam did not identify any bleeding, broken teeth, or wounds, and Plaintiff showed no signs of respiratory distress. (*Id.* at 125, 130.) Plaintiff was given intravenous fluids for polysubstance abuse, mild rhabdomyolysis, and acute renal failure. (*Id.* at 131, 133.) When Plaintiff was transferred out of the emergency room later that day, the medical records reflect that Plaintiff had "no complaints," and denied any chest or abdominal pain, nausea, vomiting, or "any other symptoms." (*Id.* at 132.) The hospital records also reflect that Plaintiff's urine drug screen tested positive for amphetamines. (*Id.*) Plaintiff was kept in the hospital overnight. Hospital records from the next day reflect that Plaintiff denied being in any pain, his gums, teeth, and tongue were intact, and his bowels were normal. (*Id.* at 120-124.) Plaintiff's principle diagnosis was amphetamine poisoning. (*Id.* at 125.) Plaintiff asserts that this diagnosis was "based on information given to hospital staff only by officers," and that he had only ingested ecstasy two days earlier. (Doc. 37 at 8-9.)

At approximately 11:00 a.m. on August 14, 2017, Defendant Blair went to the hospital and issued Plaintiff a misdemeanor citation for shoplifting. (Doc. 129-1 at 135 ¶ 4.) Blair removed Plaintiff's handcuffs and told Plaintiff that he was no longer in custody

and was under the care of the hospital.  (*Id.* ¶ 5.)  When Plaintiff was discharged from the hospital at approximately 12:45 p.m. later that day, Blair arrested Plaintiff for charges related to the search at the Jail the previous day, namely: aggravated assault on a correctional employee, taking prohibited items into a holding facility, tampering with evidence, resisting arrest with physical force, and possession of dangerous drugs.  (*Id.* ¶ 7.)  Blair placed handcuffs on Plaintiff without incident and transported him to the Tempe City Jail.  (*Id.* ¶ 9.)  Plaintiff asserts that Foth and Blair wrote falsified reports and backdated them to obtain probable cause to arrest him, and that Blair only arrested him "because of comments [Plaintiff] was making about his fellow officers."  (Doc. 37 at 9, 11.)

After a trial by jury, Plaintiff was found guilty of tampering with physical evidence, but not guilty of aggravated assault on a correctional officer, and sentenced to 4.5 years imprisonment.  (Doc. 29-1 at 138-147).

The Court has also reviewed the video footage provided by Defendants (Doc. 30),[3] and observes the following: The security camera footage (Doc. 30 Ex. 2) begins at 14:24:26 (i.e., 2:24:26 p.m.) with Plaintiff already in custody in the Tempe City Jail booking area.[4] At 14:25:25, Defendant Troy begins to search Plaintiff.  (Doc. 30 Ex. 2).  Troy removes Plaintiff's cuffs at 14:25:52, and begins a pat-down search of Plaintiff.  (*Id.*).  At 14:29:37, after Plaintiff has removed his socks, it becomes apparent that something has fallen out of one of Plaintiff's socks; Troy appears to use his foot to slide the object or objects away from Plaintiff.  (*Id.*).[5]  At 14:29:37, while speaking with Troy, Plaintiff dives and grabs

---

[3] The Court considers the facts in the light depicted by the videos, but still draws all reasonable inferences from the video in Plaintiff's favor.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

[4] This camera is identified in the video as the "North door/booking" camera.  (Doc. 27 Ex. 2)

[5] The object or objects themselves are not visible in the video footage.

1    whatever fell out of his sock, and appears to place it in his mouth.  (*Id.*).  Defendants Troy,

2    Foth, and Gneck-Smith immediately move to restrain Plaintiff.  (*Id.*).   Plaintiff is on his

3    stomach on the ground while Officer Troy appears to restrain Plaintiff's arms, and Officers

4    Foth and Gneck-Smith appear to attempt to remove the item(s) from Plaintiff's mouth.

5    (*Id.*).  Defendant Hatcher responds to the scene at 14:29:48.  (*Id.*).  An unknown fifth officer

6    responds to the scene at 14:29:55; as the fifth officer arrives, Defendant Gneck-Smith

7    draws her taser.  (*Id.*).  Defendant Troy appears to continue to restrain Plaintiff's arms; the

8    fifth officer restrains Plaintiff's legs; officers Foth and Hatcher appear to also restrain

9    Plaintiff's arms and to attempt to get him to open his mouth; and officer Gneck-Smith

10   moves to Plaintiff's right side with her taser drawn.  (*Id.*).  As the officers restrain Plaintiff,

11   it becomes difficult to see what occurs from the vantage point of the security camera.[6]  (*Id.*).

12   At 14:42:33, another officer relieves Defendant Troy in restraining Plaintiff's arms; Troy

13   continues to stand nearby.  (*Id.*).  Paramedics arrive at the scene at 14:45:55.  (*Id.*).

14        Defendant Gneck-Smith's body camera footage (Doc. 30 Ex. 3) begins at 14:37:40,[7]

15   or approximately 8:03 minutes after Plaintiff grabbed whatever had fallen out of his sock

16   and the Defendants began to restrain him.  From 14:37:40 to 14:38:09 the video has no

17   audio.  (*Id.*).  At 14:38:10, a taser discharge can be heard; the discharge lasts for one second.

18   (*Id.*).[8]  A taser prong can also be seen on the ground in front of Gneck-Smith.  (*Id.*).

19   Beginning at 14:38:14, several officers can be heard directing Plaintiff to "spit it out," and

20   stating that "you're still chewing it."  (*Id.*).  At 14:38:27, an officer can be heard saying "I

21   can see the bag in your mouth."  (*Id.*).  Beginning at 14:38:42, officers can again be heard

22   directing Plaintiff to "spit it out."  (*Id.*).  The officers do so again beginning at 14:39:22.

23   (*Id.*).  At 14:39:29 Plaintiff states "I don't have nothing," and repeatedly shouts "Please

24   stop!" for approximately one minute.  (*Id.*).  At 14:39:54, an officer states "It will all be

---

25

26        [6] The Court further notes that the security camera footage has no audio.

27        [7] The time stamp in the video is given as 21:37:40 Zulu, which is seven hours ahead
     of Tempe local time.

28        [8] This is the only instance in any of the videos in which it is obvious that any
     Defendant discharges a taser.

over as soon as you spit it out." (*Id.*).  At 14:40:55, an officer refers to "that pink bag that's in your mouth that we've all seen, that's hanging out of your mouth, spit it out." (*Id.*). Another officer can be heard saying "it's on the roof of his mouth." (*Id.*).  Officers can then be seen placing their fingers in Plaintiff's mouth, and applying a pressure point to his nose for approximately two seconds.  (*Id.*).[9]  Plaintiff shouts "I don't have nothing," and another officer can be heard saying "I can't see it anymore.  Did you fricking swallow it?" (*Id.*).  Plaintiff shouts "I don't have nothing," and then screams incoherently and shouts "Please stop!" for approximately 30 seconds.  (*Id.*).  At 14:42:00, Plaintiff repeatedly states "Jesus please" and again screams incoherently for approximately 30 seconds.  (*Id.*). Beginning at 14:42:33, Plaintiff repeatedly accuses the officers of "shocking me on my arms"; no taser discharge can be heard, and the officers respond "it's not even going" and "it's not even on." (*Id.*).  Beginning at 14:42:42, Plaintiff appears to relax, and no longer screams, but instead quietly says "please Jesus" or "thank you, Jesus" at various points over the next minute.  (*Id.*).  At 14:44:05, Plaintiff states "you have the fucking taser on this whole time;" no taser discharge can be heard, and the officers respond "it's not on right now." (*Id.*).  Plaintiff responds, "yes, it is"; no taser discharge can be heard.  (*Id.*).  At 14:44:33, Plaintiff states that his "heart is pumping so hard"; an officer responds that "it's probably from all that methamphetamine you just ingested." (*Id.*).  At 14:44:36, Plaintiff begins to state over and over "please, Jesus, don't let them kill me"; an officer responds "don't worry, we'll get you to the hospital." (*Id.*).  At 14:45:06, an officer states "are you going to relax for us?" and Plaintiff responds "I can't relax, I'm being shocked"; no taser discharge is audible and an officer responds "no, you're not." (*Id.*).  Plaintiff then screams incoherently for approximately 10 seconds; an officer can be heard stating "nothing's happening to you." (*Id.*).  At 14:44:04, leg shackles are placed on Plaintiff.  (Doc. 30 Ex. 4).  At 14:45:52,[10] officers can be heard talking with the paramedics.  (Doc. 30 Ex. 3).

---

[9] This is the only instance in any of the videos in which the officers can be seen placing anything in Plaintiff's mouth.

[10] There appears to be a slight difference in the displayed time between the security camera video and the body camera videos (i.e. their timestamps have not been

Once the paramedics respond, officers can be heard telling them that they "found drugs … in his socks," that Plaintiff had "grabbed a couple baggies" and "chewed both of them and swallowed them," and that they contained "most likely meth." (*Id.*). One of the officers also informed the paramedics that Plaintiff is diabetic and takes high blood pressure medication. (*Id.*). At 14:46:42, Hatcher and Gneck-Smith remove a total of three taser barbs from Plaintiff's right side, approximately halfway between his armpit and his waist. (Ex. 30 Doc. 5). Gneck-Smith also picks up the taser barb on the floor. (*Id.*).[11] At 14:48:30, an officer asks what Plaintiff's charges are, and Foth responds "it's going to be agg assault because he bit her, drugs, and shoplifting warrants." (*Id.*).

At 14:49:26, while the officers continue to restrain Plaintiff, the paramedics administer an injection to Plaintiff's buttocks. (Doc. 30 Ex. 2). At approximately that same time, Foth asks one of the paramedics to "check" Hatcher because "she was bit." (Doc. 30 Ex. 4). Hatcher shows her right thumb to the paramedics and states "he just got me right here" while pointing to her knuckle. (*Id.*). At 14:50:46, paramedics administer a second injection to Plaintiff's buttocks. (*Id.*).[12] At 14:51:30, the paramedics note that Plaintiff "might be out" (Doc. 30 Ex. 5), and by 14:51:55, Plaintiff appears to be unconscious and the officers begin to "let up" and stop physically restraining him. (Doc. 30 Ex. 2). Plaintiff is rolled onto his back, and, at 14:53:02, the officers assist the paramedics in lifting Plaintiff onto a gurney. (*Id.*). Plaintiff is mechanically restrained on the gurney with straps, searched, and a spit bag is placed over his head. (*Id.*). At approximately 14:56:21, the paramedics wheel Plaintiff out of the jail to a waiting ambulance. (*Id.*). Foth and another, unidentified officer accompany Plaintiff and the paramedics in the ambulance to the hospital. (Doc. 30 Ex. 5).

---

synchronized).

[11] The Court notes that no taser barbs or wires were wrapped around or otherwise in contact with Plaintiff's handcuffs.

[12] The Court notes that the audio for Doc. 30 Ex. 4 — identified as "AXON BODY 2 X81016031 — ends at 14:1:05.

1   At the hospital, Plaintiff is placed on his back on a hospital bed.  (Doc. 30 Ex. 6).[13]

2   All of his clothes except for his underwear are removed by nurses in order to attach several

3   monitoring devices (i.e., a heartrate monitor, blood pressure monitor, etc.).  (*Id.*).  At no

4   point during any of the videos is a body cavity search performed on Plaintiff, though one

5   of the nurses does briefly catheterize him while he is unconscious to obtain a urine sample.

6   (*Id.*).  The Court did not observe any blood or injuries on Plaintiff in any of the videos.

7   **IV.   Discussion**

8       **A.   Count Two**[14]

9           **1.   Fourth Amendment Standard**

10   In Count Two of the Complaint, Plaintiff claims Defendants Hatcher, Gneck-Smith,

11   Troy, Marufo, and Foth used excessive force against him at the Tempe City Jail on August

12   13, 2017.[15]   The standard used to analyze an excessive-force claim depends on the

13   plaintiff's status at the time of the alleged use of excessive force.  If the alleged use of

14   excessive force was applied during the plaintiff's arrest, the Fourth Amendment objective-

15   reasonableness standard applies.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Here,

16

17   ───────────────

18       [13] The Court notes that Doc. 30 Ex. 6 — identified as "AXON BODY 2 X81001855" — has no audio.

19

20       [14] Because the alleged excessive force occurred first, the Court will discuss Plaintiff's allegations in Count Two before the allegations in Count One.

21       [15] To the extent Plaintiff also alleges a failure-to-train or supervise claim against

22   Hatcher (Doc. 1 at 15), Hatcher asserts that she is entitled to summary judgment on this portion of Plaintiff's claim because Plaintiff has presented no evidence in support of it.

23   (Doc. 28 at 15 n.4).  To state a claim for failure to train, a plaintiff must allege facts to support that the alleged failure amounted to deliberate indifference.  *Cannell v. Lightner*,

24   143 F.3d 1210, 1213 (9th Cir. 1998).  A plaintiff must allege facts to support that not only was particular training inadequate, but also that such inadequacy was the result of "a

25   'deliberate' or 'conscious' choice" on the part of the defendant.  *Id.* at 1213-14; *see Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (a plaintiff must allege facts to support that

26   "in light of the duties assigned to specific officers or employees, the need for more or different training is [so] obvious, and the inadequacy so likely to result in violations of

27   constitutional rights, that the policy[]makers . . . can reasonably be said to have been deliberately indifferent to the need." (quoting *City of Canton v. Harris*, 489 U.S. 378, 390

28   (1989))).  Plaintiff has presented no evidence that Hatcher was responsible for training the other defendants, or that Hatcher was aware of any dangerous condition placing Plaintiff at risk of harm but failed to address it.  *See* Part IV.B, *infra*.  Accordingly, Hatcher is entitled to summary judgment on this portion of Plaintiff's claim in Count Two.

1  although Plaintiff had already been arrested, he had not yet been booked or charged with
2  any crime.  Accordingly, the Court will apply the Fourth Amendment standards.

3       A claim that law enforcement officers used excessive force in the course of an arrest
4  is analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham*, 490
5  U.S. at 395.  This inquiry requires a "careful balancing of the nature and quality of the
6  intrusion on the individual's Fourth Amendment interest against the countervailing
7  governmental interests."  *Id.*

8       To determine whether a Fourth Amendment violation has occurred, the court
9  conducts a three-step analysis assessing: (1) the nature of force inflicted; (2) the
10  governmental interests at stake, which involve factors such as the severity of the crime, the
11  threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham*
12  factors"); and (3) whether the force used was necessary.  *Espinosa v. City & Cnty. of San
13  Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97, and
14  *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

15       "The reasonableness of a particular use of force must be judged from the perspective
16  of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."
17  *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).  This is
18  because "[t]he calculus of reasonableness must embody allowance for the fact that police
19  officers are often forced to make split-second judgments—in circumstances that are tense,
20  uncertain, and rapidly evolving—about the amount of force that is necessary in a particular
21  situation."  *Graham*, 490 U.S. at 396-97.

22       At the summary judgment stage, once the court has "determined the relevant set of
23  facts and drawn all inferences in favor of the nonmoving party to the extent supportable by
24  the record," the question of whether or not an officer's actions were objectively reasonable
25  under the Fourth Amendment is a "pure question of law."  *Scott*, 550 U.S. at 381 n.8.  But
26  an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's
27  favor, could support a finding of excessive force.  *Smith v. City of Hemet*, 394 F.3d 689,
28  701 (9th Cir. 2005).  Because the excessive force balancing test is "inherently fact specific,

the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

### 2.   Analysis

#### a.   Nature of the Force Inflicted

It is undisputed that the Defendants restrained Plaintiff on the ground for approximately 15 minutes and used a taser on him several times. Defendants assert that Plaintiff was tased three times, while Plaintiff believes he was tased seven times. Plaintiff bases this belief on having listened to the video footage (Doc. 30) when it was presented at his state criminal trial.[16]   At his deposition, however, Plaintiff testified that he had not actually *seen* — as opposed to simply *hearing* — the video footage.[17]   Having viewed the

---

[16] *See* Deposition of Plaintiff:

Q:  I think I understand what you're saying. In the complaint, you say that you were tased several times, and then in other parts of the complaint, you say that you were tased seven times?

A:  That's just what I kind of — specifically from trial, throughout the trial, when everything was going on, that's what I — that's where my count was at.

Q:  So you came up with the number seven by —-

A:  By my count at trial.

. . .

Q:  So the number seven, being tased seven times, how did you count that from watching the video?

A:  Just through from what I heard and from what the officers were saying when they — like, it's just recollection, my recollection from the trial, while everything was going on, I figured it to be about seven times…"

(Doc. 29-1 at 81-2, pg. 64: 23 – 65:6, 65:15 — 65:21)

[17] *See* Deposition of Plaintiff:

Q:  I thought you said you saw a body-worn camera at trial.

---

video footage, and noting that Plaintiff often screamed and claimed to be tased when he was not being tased, the Court finds that no reasonable jury would conclude that Plaintiff was tased seven times.

Defendants assert that Plaintiff was tased three times, one of which failed to deliver any electrical charge.  (Doc. 31 at 5 ¶ 21; Doc. 29-1 at 94 ¶ 8; Doc. 29-1 at 97 ¶ 5.)  However, Sergeant Whit Roesch indicates in his affidavit — and provides a taser deployment log in support — that Gneck-Smith's taser was deployed *four* times, one of which failed to deliver a charge.  (Doc. 29-1 at 97 ¶ 6).  The Court is unable to determine how Sergeant Roesch determined, from the log he provides in support (Doc. 29-1 at 100), that the first taser deployment failed to deliver a charge.  As such, the evidence supports thatDefendants used a taser on Plaintiff no more than four times — twice for five seconds each, and two additional times for one second each.  (Doc. 29-1 at 100; Doc. 30 Exs. 3, 5).  The use of a taser can constitute a significant use of force.  *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (use of a taser "in dart-mode constitute[s] an intermediate, significant level of force that must be justified by the governmental interest involved.")

Plaintiff also alleges that Defendants performed a cavity search on him, which left him bleeding from his anus.  (Doc. 1 at 8).[18]  The court finds that no reasonable inference

_____

A:  They played them at trial.  I couldn't see them.

Q:  You couldn't see them?

A:  No.

Q:  From where you were sitting?

A:  I couldn't see them at trial.

Q:  Why couldn't you see them at trial?

A:  I wasn't physically able to see — I've never seen them.  I've never seen them.

(Doc. 29-1 at 82, pg. 68:12 — 68:21).  In his controverting statement of fact, Plaintiff maintains that "the basis for [Plaintiff] saying he was tased seven times is because that's how many times he was tased."  (Doc. 37 at 6).

[18] *See also* Deposition of Plaintiff:

from the video footage can be drawn to support this allegation.  The video evidence demonstrates that Plaintiff's clothes were on until he was at the hospital, making it unlikely that any Defendant would have been able to "r[u]n their hands, finger, into [Plaintiff]" at any time during the altercation.  The jail security camera footage, which covers the entirety of Plaintiff's time in the Tempe City Jail and in which Plaintiff is visble at all times, shows that no cavity search was performed on Plaintiff.  Accordingly, the Court finds that no reasonable jury would conclude that a body cavity search occurred.

Finally, Plaintiff asserts that Defendant Hatcher broke his teeth by running a finger and/or a pen through his mouth while trying to remove the drugs Plaintiff had ingested.  Plaintiff asserts that one of his teeth was broken down to the root, later requiring surgery, and that another tooth was chipped.  Plaintiff provides an unverified and undated x-ray and orthopedic report substantiating his allegations that one of his teeth was broken and required surgery.[19]  (Doc. 37 at 15-16).  The video evidence is inconclusive whether any

---

Q:  What is the basis for saying that there was a cavity search done?

A:  Because there was a cavity search done, and I'm telling you they had their hands in — physically on me, opening up my butt cheeks, running — somebody ran their hands, finger into me, and then they grabbed my nuts and all that, did everything that they were doing.  I though they were about to put the taser on my private parts.

Q:  And you believe it was police officers who were doing that and not Tempe fire when they came to —

A:  No.  This was — that right there, that happened right before.  This was not at the end of the — this was not at the end of the — the altercation.

(Doc. 29-1 at 83, pg. 69:15 – 70:2).

[19] To the extent Defendants assert that this evidence is inadmissible (Doc. 38 at 8), they misconstrue the relevant standard on summary judgment.  The Ninth Circuit held in *Fraser v. Goodale*, 342 F.3d 1021, 1036 (9th Cir. 2003), that at summary judgment, courts "do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents."  342 F.3d at 1036.  Further, the Supreme Court has explained that this caveat applies to the *nonmovant*: "[w]e do not mean that *the nonmoving party* must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (emphasis added).  Thus, "[m]aterial in a form not admissible in evidence may be used to avoid, but not to obtain summary judgment[.]"  *Walters v. Odyssey Healthcare Mgmt. Long Term Disability Plan*, No. CV-11-00150-PHX-JAT, 2014 WL 4371284, at *3 (D. Ariz. Sep. 4, 2014) (internal quotation omitted); *see Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985) (noting that at summary judgment, "we treat the opposing party's papers more indulgently than the moving party's papers").

Defendant used a pen on or in Plaintiff's mouth.  Defendant Gneck-Smith's bodycam footage demonstrates that the Defendants placed their fingers in Plaintiff's mouth at least once.  (Doc. 30 Ex. 3 at approximately 14:40:55).  As such, drawing all inferences in Plaintiff's favor, the record shows that the force used during Plaintiff's arrest was enough to cause pain and some physical injury, which must be justified by a similar level of "government interest [that] compels the employment of such force."

### b.     Governmental Interest

In evaluating the government's interest in the use of force, the Court considers the severity of the crime, the threat posed by the suspect, and whether the suspect resisted arrest or attempted to flee.  *Miller*, 340 F.3d at 964.

Here, Defendants restrained Plaintiff because they believed he was destroying evidence and feared that he could suffer a lethal overdose if he swallowed the drugs.  Plaintiff did not pose a substantial threat to the Defendants during the altercation as he was restrained on the ground for nearly the entire incident.  However, there is evidence to support that Plaintiff resisted the officers' attempts to remove the suspected drugs from his mouth.  Based on these facts, the Court finds that the government had a sufficient interest in using force on Plaintiff to gain his compliance.

### c.     Necessity of Force

Finally, the Court must balance the force used against the need for such force to determine whether the force used was "greater than reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)).  This determination is judged from the perspective of a reasonable officer on the scene.  *Graham*, 490 U.S. at 396-97.  Where there is no need for force, any forced used is excessive.  *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated and remanded on other grounds*, *Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001).  Thus, as the Ninth Circuit has observed, "[u]nderlying *Graham*'s objective-reasonableness test is the clear principle that the force used to make an arrest 'must be balanced against the need for force: it is the need for force which is at

the heart of the *Graham* factors.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (quoting *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)).

Here, Defendants contend that their use of force was within departmental policy, and necessary to prevent the destruction of evidence and a possible lethal overdose.  (Doc. 29-1 at 3 ¶¶ 15-16; *id.* at 6-7 ¶¶ 12-13; Doc. 28 at 3).   Plaintiff responds that if the Defendants were afraid that he had ingested dangerous and illicit drugs, they should have just called the paramedics to deal with the situation medically, especially given that the paramedics were stationed next door to the jail and responded in less than a minute.  (Doc. 37 at 7) ("Officers knew that medical assistance was less than [one] minute away but chose to torture [Plaintiff] for approximately 13 minute[s] doing what they say were rudimentary life-saving techniques of breaking [Plaintiff's] teeth, shoving a pen down his throat, and tasing him acting in deliberate indifference to his health.").  Defendants reply that it would not have been safe for the paramedics to treat Plaintiff until he was restrained, and that they would not have called paramedics until they perceived that Plaintiff had actually ingested the drugs.  (Doc. 38 at 9).

As such, the question of when, exactly, Plaintiff ingested the drugs is disputed. Plaintiff contends that he swallowed the drugs within the first 30 seconds, and that thereafter he could not have been observed chewing or having anything in his mouth.  (Doc. 38 at 4).  Defendants assert that they observed the drugs in Plaintiff's mouth and Plaintiff chewing on them for approximately 10 minutes during the altercation.  (Doc. 29-1 at 3-4; 62-63; 95).  As such, whether or not Plaintiff had ingested the drugs at the time the Defendants used force on him is relevant to whether that use of force was necessary.  Put another way, as a matter of *fact* — as distinct from Defendants' *belief*, see Part IV.3, *infra* — if Plaintiff had already ingested the drugs at the time the Defendants used pressure points, a taser, and their fingers and a pen on Plaintiff, then there is a genuine question as to whether that use of force was necessary under the circumstances.  Based on this record, there is a genuine issue of material fact whether the force used on Plaintiff was greater than reasonable under the circumstances.  The Court will therefore consider whether Defendants

1     are entitled to qualified immunity.  (Doc. 28 at 13-15).

2                 **3.**      **Qualified Immunity**

3                       a.     <u>Legal Standard</u>

4         Government officials are entitled to qualified immunity from civil damages unless

5 their conduct violates "clearly established statutory or constitutional rights of which a

6 reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

7 Officials are not entitled to qualified immunity if "(1) they violated a federal statutory or

8 constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at

9 the time.'" *District of Columbia v. Wesby,* — U.S. —, 138 S. Ct. 577, 589 (2018) (quoting

10 *Reichle v. Howards,* 566 U.S. 658, 664, (2012)).  Courts may address either prong first,

11 depending on the circumstances in the particular case.  *Pearson v. Callahan*, 555 U.S. 223,

12 230–32, 235-36 (2009).

13         For a right to be clearly established there does not have to be a case directly on

14 point; however, "'existing precedent must have placed the statutory or constitutional

15 question beyond debate.'" *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 551 (2017) (quoting

16 *Mullenix v. Luna,* — U.S. —, 136 S. Ct. 305, 308 (2017)).  Accordingly, a right is clearly

17 established when case law has been "earlier developed in such a concrete and factually

18 defined context to make it obvious to all reasonable government actors, in the defendant's

19 place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868

20 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551).  To determine whether

21 qualified immunity applies, the court must first identify the federal or constitutional right

22 at issue; then it must attempt to "identify a case where an officer acting under similar

23 circumstances as [the defendant] was held to have violated" that right.  *Id*.  If there is no

24 such case, then the right was not clearly established, and the officer is protected from suit.

25 *See id.* at 1117-18.  "This is not to say that an official action is protected by qualified

26 immunity unless the very action in question has previously been held unlawful, but it is to

27 say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*,

28 536 U.S. 730, 739 (2002) (internal citations omitted).

1

### b.     Discussion

2      Here, the Defendants believed that Plaintiff had ingested dangerous drugs that posed

3  a threat to his health and was attempting to destroy evidence.  (Doc. 29-1 at 3 ¶¶ 15-16; *id.*

4  at 6-7 ¶¶ 12-13.).   Although Plaintiff disputes that the drugs were in pills rather than

5  baggies, that the drugs were not dangerous,[20] and that he had swallowed the pills within

6  "30 seconds" of having ingested them, he provides no evidence that the Defendants were

7  aware that the drugs were not dangerous, or that he had swallowed them 30 seconds into

8  the altercation.  Indeed, Plaintiff specifically asserts that the Defendants had "mistaken"

9  his tongue for baggies of drugs.  (Doc. 37 at 4).  As such, even if Defendants' beliefs as to

10  what Plaintiff had ingested were incorrect, the excessive force analysis turns on whether

11  their force used in response to their belief was reasonable.

12      Numerous courts, including in this Circuit, have recognized that officers may use

13  force, including use of a taser and pressure points, in attempting to open a detainee's mouth

14  to try to stop the non-compliant detainee from swallowing a suspected illegal drug in order

15  to prevent an overdose and destruction of evidence.  *See, e.g., U.S. v. Caldera*, 421 F.23d

16  152 (9th Cir. 1970) (finding no Fourth Amendment violation when a person detained by

17  border patrol was subjected to an x-ray after she was seen placing something in her mouth

18  that officers believed was heroin, and that there was no Fifth Amendment violation because

19  "[t]he conduct of Mrs. Caldera required reasonable force to subdue her and to prevent her

20  apparent attempt to swallow the evidence"); *Pennington v. Terry*, 644 Fed. App'x 533,

21  544-47 (6th Cir. 2016) (finding that the law supported use of force, including a stun gun,

22  to attempt to prevent a detainee from overdosing and from destroying evidence) (citing

23  *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997) (finding use of pepper spray was

24  reasonable in an attempt to stop a person from overdosing)); *Stogner v. Sturdivant*, 515

25  Fed. App'x 280 (5th Cir. 2013) (finding the use of force a chokehold was reasonable in an

26  attempt to get the detainee to spit out the bag of methamphetamine when the detainee

27

28

[20] The Court notes that Plaintiff was repeatedly asked during his deposition what the drugs were, and that he refused to answer.  (Doc. 29-1 at 76, 78).

struggled and refused to spit out the bag); *Sanders v. City of Dothan*, 409 Fed. App'x 285, 290 (11th Cir. 2011) (holding use of a Taser to force an arrestee to open his mouth did not violate a clearly established right where the officer reasonably believed the arrestee was trying to swallow drugs); *Nickols v. Morris*, 705 F. Supp. 2d 579, 588-91 (N.D. Tex. 2010) (granting summary judgment to defendants on the Fourth Amendment claim because the seizure was reasonable and the force used was not excessive where officers restrained the plaintiff after arrest and used a pressure-point technique in an attempt to get her to spit out the cocaine she was chewing and attempting to swallow, ignoring their orders to spit out the drugs).

Here, defendants restrained Plaintiff for approximately 15 minutes, used pressure points and a taser in an attempt to prevent him from swallowing what they believed to be dangerous drugs, and that once it became clear to the Defendants that Plaintiff had swallowed the drugs, they immediately called for paramedics. Plaintiff has pointed to no case, and this Court has been unable to locate one, that clearly establishes that, under these or similar circumstances, Defendants' use of force violated Plaintiff's rights. Defendants are therefore entitled to qualified immunity on Plaintiff's Fourth Amendment excessive force claim in Count Two.

## B.     Count One

The nature of Plaintiff's claim in Count One is somewhat unclear, but it appears to be a claim of malicious prosecution related to his charge, and later acquittal, for aggravated assault on a correctional officer, i.e., for allegedly biting Defendant Hatcher.[21] Plaintiff disputes that he bit Hatcher, and alleges that Defendants fabricated their police reports in order to obtain probable cause to arrest him. Although often evasive, it appears that Plaintiff is asserting that Officer Foth back-dated her incident report in order to match

---

[21] *See* Doc. 1 at 10 ("Officers Foth and Blair conspired to alter the version of what transpired that day, which led to the falsification and omission of evidence from police reports, resulting in malicious prosecution."). To the extent Plaintiff may also be attempting to raise a Fourth Amendment excessive force claim in Count One, Defendants are entitled to summary judgment on that portion of Count One for the same reasons as those set forth in Part IV.A, *supra*.

Defendant Blair's probable cause statement in order to arrest Plaintiff for allegedly biting Defendant Hatcher.[22]  Plaintiff notes that he was found not guilty of that charge after a trial by jury.  (Doc. 37 at 5).

"Malicious prosecution, by itself, does not constitute a due process violation; to prevail [a plaintiff] must show that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right."  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189

_____

[22] *See, e.g.,* Deposition of Plaintiff:

> Q:  You claim that Officer Foth back-dated her complaint or incident report?
>
> A:  Yes.
>
> Q:  What's the basis of saying that?
>
> A:  Basically, you can just look at all the reports and you will be able to tell yourself.
>
> . . .
>
> Q:  And you also assert that Officer Foth used a template from Officer Blair for her incident report?
>
> A:  Yes.
>
> Q:  What's the basis for saying that?
>
> A:  All you have to do is look at the reports.  You'll see for yourself.
>
> . . .
>
> Q:  I am not asking for everything.  I am asking for everything that you can recall at this moment as to what made you say that Officer Foth's report is a template or Officer Foth used a template from Officer Blair for her report.
>
> A:  It's — if you look at both reports, you can be able to tell yourself.
>
> Q:  Why do you say that?
>
> A:  It's blatant.  It's plain as day.
>
> Q:  What is blatant and plain as day?  What makes them the same to you?
>
> A:  I don't — I'm not.  I don't think we're getting anywhere on this question so —

(Doc. 29-1 at 71-2, pgs. 24:15-20, 25:12-17; 27:3-15).

(9th Cir. 1995); *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) (*en banc*) ("an exception exists . . . when a malicious prosecution is conducted with the intent to deprive a person of equal protection of the law or is otherwise intended to subject a person to denial of constitutional rights"); *Cline v. Brusett*, 661 F.2d 108, 112 (9th Cir. 1981).  For example, a plaintiff may state a § 1983 claim when he alleges that the prosecution was motivated by "racial animus."  *See Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 624 (9th Cir. 1988); *Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987).  In addition, a plaintiff may state a § 1983 claim when he asserts that state actors conspired to deny him a fair trial and convict him on groundless charges.  *See Bretz,* 773 F.2d at 1031.  However, it is not enough for a plaintiff to simply list the charges brought against him and note that they were dismissed.  *Freeman*, 68 F.3d at 1189.  "[T]he mere fact that a prosecution was unsuccessful does not mean it was not supported by probable cause."  *Id.*  The plaintiff must present specific facts indicating the lack of probable cause.  *Id.*  Additionally, when a conspiracy is alleged, a complainant must present specific facts to support his claim that defendants entered into a conspiracy.  *Karim-Panahi*, 839 F.2d at 626 (the mere allegation of conspiracy without factual specificity is insufficient).  Allegations of conspiracy must be supported by material facts, not mere conclusory statements.  *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983); *see also, Aldabe v. Aldabe*, 616 F.2d 1089 (9th Cir. 1980); *Manis v. Sterling*,  862 F.2d 679, 681 (8th Cir. 1988) (allegations of conspiracy must be pled with sufficient specificity and factual support to suggest a "meeting of the minds").

Defendants assert that the fact that Blair repeated information from Foth's report in securing a warrant for Plaintiff's arrest does not support a malicious prosecution claim, and that Plaintiff has presented no evidence to support that Defendants lacked probable cause to arrest him for allegedly biting Hatcher.  (Doc. 28 at 16-17).  Plaintiff asserts that he did not bite Hatcher, as evidenced by his acquittal at trial, and appears to assert that Blair's report must have been "fabricated" because Blair was not present during either Plaintiff's arrest or subsequent altercation at the jail and therefore he could not have testified to his knowledge of the facts asserted in the probable cause statement? because he did not have

such personal knowledge.  (Doc. 37 at 2) ("Officer Blair[']s falsified reports in which he claims to have personally transported [Plaintiff] to Tempe City Jail, and personally recognized baggies containing a white crystalline substance which he[,] through his training and experience[,] recognized to be methamphetamine.").  While there is no question that Blair was not present on August 13, 2017 for Plaintiff's arrest or the subsequent altercation at the Tempe City Jail, and that Blair's only involvement in the case was to arrest Plaintiff the next day after Plaintiff was released from the hospital, Blair's reliance, even verbatim, on Foth's and the other officers' recitation of events does not support that Blair's probable cause application was invalid.  *See e.g. United States v. Bridges*, 344 F.3d 1010, 1014-15 (9th Cir. 2003) ("an affidavit [in support of a search warrant application] may be based on hearsay information and need not reflect the direct personal observations of the affiant").

Further, the fact that Plaintiff was later found not guilty of biting Hatcher does not, *ipso facto*, mean that Blair and/or Foth were lying when they *alleged* that Plaintiff had bit Hatcher.  To prevail on a claim that a defendant police officer obtained a warrant by judicial deception, a plaintiff "must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause."  *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (citing *Galbraith v. Cnty. of Santa Clara,* 307 F.3d 1119, 1126 (9th Cir. 2002)); *see also Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) ("A plaintiff must make (1) a substantial showing of deliberate falsehood or reckless disregard for the truth, and (2) establish that but for the dishonesty, the challenged action would not have occurred.") (internal quotation marks omitted).  However, "[o]missions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause."  *United States v. Smith,* 588 F.2d 737, 740 (9th Cir. 1978).  Nor may a claim of judicial deception be based on an officer's erroneous assumptions about the evidence he has received.  *Id.* at 739–40; *Ewing v. City of Stockton*, 588 F.3d 1218, 1223–24 (9th Cir. 2009).  Plaintiff has presented no evidence to support that either Foth or Blair had no basis to allege that Plaintiff had bitten Hatcher.

1    Indeed, Hatcher herself can be seen in the video footage showing paramedics where she

2    believed Plaintiff had bitten her, stating "he just got me right here" while pointing to her

3    knuckle (Doc. 30 Ex. 4 at approximately 14:49:26),[23] and Plaintiff admits that he may have

4    accidentally bit Hatcher.  (Doc. 37 at 5; Doc. 29-1 at 71).  Nor has Plaintiff presented any

5    specific evidence supporting that Defendants engaged in a conspiracy to deny him a

6    protected right in violation of the Fourteenth Amendment.  Defendants are thus entitled to

7    summary judgment on Count One.[24]

8    **IT IS ORDERED:**

9        (1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants'

10   Motion for Summary Judgment (Doc. 28).

11       (2)    Defendants' Motion for Summary Judgment (Doc. 28) is **granted**, and this

12   action is terminated with prejudice.  The Clerk of Court must enter judgment accordingly.

13       Dated this 3rd day of August, 2020.

14

15                                             Michael T. Liburdi

16                                             Michael T. Liburdi
                                               United States District Judge
17

18   _____

19       [23] The Court notes that Plaintiff may have been found not guilty — which is not the
20   same as being found innocent — of aggravated assault because the jury may have
     determined that Plaintiff *accidentally* or *inadvertently* bit Hatcher, rather than with the
     intent necessary to sustain an aggravated assault conviction.  *See* Ariz. Rev. Stat. § 13-
21   1204(A)(10) (requiring that to be found guilty of aggravated assault, a person must, in part,
     "intentionally, knowingly, or recklessly" cause injury to another person).

22       [24] To the extent that Plaintiff also alleges that Defendants committed "negligent
23   infliction of emotion distress" on him, he has similarly failed to present any evidence
     supporting this claim.  In order to prevail on a negligence claim, a plaintiff must prove: (1)
24   a duty of the defendant to conform to a standard of conduct recognized by law for the
     protection of others against unreasonable risk; (2) the failure of the defendant to conform
25   to the required standard; (3) a reasonably close causal connection between the defendant's
     conduct and the resulting injury; and (4) actual loss or damage.  *See Ontiveros v. Borak*,
26   667 P.2d 200, 204 (Ariz. 1983).  Plaintiff has failed to provide any evidence that
     Defendants failed to conform their actions to the proper standard of care—indeed, Plaintiff
27   has failed to even identify what the proper standard of care might be—nor has he provided
     any evidence to support that Defendants' actions placed him at an unreasonable risk of
28   injury as a result.  Accordingly, to the extent Plaintiff may have attempted to raise a
     negligent infliction of emotional distress claim, Defendants are entitled to summary
     judgment on it.